UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD GRANT CHAMPNEY,                    :
                                          :
                    Petitioner            :
            vs.                           :    CIVIL NO. 1:CV-04-0502
                                          :
JEFFREY BEARD, et al.,                    :    (Judge Caldwell)
                                          :
                    Respondents.          :
                                          :

FILED
HARRISBURG, PA

JAN 0 5 2009

MARY E. D'ANDREA, CLERK
Per_____
          Deputy Clerk

*MEMORANDUM*

I.    *Introduction*

        On March 8, 2004, almost five years ago, Petitioner, Ronald Grant

Champney, an inmate at SCI-Greene, Waynesburg, Pennsylvania, initiated these

proceedings by filing a counseled petition under 28 U.S.C. § 2254. Petitioner is

challenging 1998 convictions in the Court of Common Pleas of Schuylkill County,

Pennsylvania, for, among other things, burglary, terroristic threats, robbery, simple

assault and recklessly endangering another person. The original petition made twenty

claims for relief and since then Petitioner has sought to add seven more by way of

amendment and a motion to file an amended petition.

        Respondents moved to dismiss the petition as barred by the one-year

statute of limitations. We stayed the proceedings because Petitioner was also pursuing

state postconviction proceedings that might have had the effect of restarting the

limitations period. The state courts completed their review of the case by deciding that

Petitioner's pursuit of his state postconviction remedies was untimely, so we still confront whether the petition is time-barred. Petitioner presents several arguments why it is not. The principal one is that the limitations period was equitably tolled because he was, and always has been, mentally incapable of complying with section 2254's filing requirements. In May 2009, a hearing was held on the competency issue, and the parties filed post-hearing briefs.

The court concludes there is no circumstance warranting statutory or equitable tolling. We will therefore dismiss Petitioner's claims as time-barred, with the exception of Claim 27, and that claim will be dismissed on the merits.

II.    *Background*

A.    *State-Court Procedural History*

On November 13, 1998, a jury convicted Champney of burglary, two counts of robbery, criminal attempt (theft), two counts of simple assault, terroristic threats, two counts of recklessly endangering another person and criminal conspiracy. On January 6, 1999, he received an aggregate sentence of fourteen and one-half to forty years' imprisonment. *See Commonwealth v. Champney*, 783 A.2d 837, 838 (Pa. Super. 2001).

Petitioner immediately attempted to overturn the verdict. Before sentencing, on November 20, 1998, he filed a pro se "petition for postconviction relief [and] notice of appeal." The Clerk of Court sent this document to his counsel. After sentencing, on January 19, 1999, Champney attempted to file a second pro se "petition

-2-

for postconviction relief [and} notice of appeal," as well as a motion to dismiss his trial counsel. Because he was represented by counsel, *see* Pa. R. Crim. P. 576, the Clerk of Court again forwarded these documents to trial counsel. 783 A.2d at 838-39.

Champney's trial counsel did not take a direct appeal because Champney had not paid him, and counsel successfully withdrew from the case on February 9, 1999, but not before he had allowed the appeal period to expire. *Id.* at 839. On February 23, 1999, Champney filed a third pro se "Petition for Post Conviction Relief/Notice of Appeal." *Id.* The trial court dismissed this petition on February 26 "on the basis that Champney had not exhausted his rights pursuant to the appellate process." *Id.*

On March 1, 1999, Petitioner filed a pro se notice of appeal from the judgment of sentence. Counsel was appointed for this attempt at a direct appeal from conviction, but the Pennsylvania Superior Court dismissed the appeal as untimely. *Commonwealth v. Champney*, 747 A.2d 409 (Pa. Super. 1999) (unpublished memorandum); *see also Champney*, 783 A.2d at 839.

On February 4, 2000, Champney filed his first petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. C.S. §§ 9501-9546, raising "various issues including trial counsel's failure to pursue a direct appeal." 783 A.2d at 839. The public defender was appointed to represent him. (Doc. 1, 2254 petition, ¶ 10). On November 15, 2000, after three evidentiary hearings, the trial court denied Champney's PCRA petition on the merits. 783 A.2d at 838. However, on September 13, 2001, the superior court reversed and reinstated Champney's direct-appeal rights after

-3-

finding that "trial counsel's conduct was egregiously objectionable" since he "completely failed to preserve Champney's appellate rights by filing a notice of appeal even after he was certainly aware that Champney wanted to file an appeal." *Id.* at 841.

The public defender successfully moved for appointment of private counsel to represent Champney on his direct appeal because the public defender had represented Champney's co-defendant. (Doc. 1, 2254 petition at ¶ 12). Private counsel filed an *Anders* brief[1] and sought to withdraw. On November 7, 2002, the superior court disposed of the direct appeal by affirming the judgment of sentence, even though it disagreed with counsel's view that the appellate claims were frivolous. (Doc. 1 at ¶ 14; *Commonwealth v. Champney*, No. 1641 MDA 2001, 816 A.2d 326 (Pa. Super. 2002) (unpublished memorandum); superior court docket, available on http://ujsportal.pacourts.us).[2]

On March 8, 2004, Petitioner filed the instant 2254 petition. On the same date, he also filed a second PCRA petition in the Schuylkill County Court of Common Pleas. (Doc. 1, 2254 petition at ¶ 15). On April 1, 2004, the trial court dismissed the PCRA petition as jurisdictionally barred by the one-year deadline for filing PCRA petitions. (Doc. 27-3, Ex. A, *Commonwealth v. Champney*, No. 691 MDA 2004 (Pa. Super. 2004)(unpublished memorandum).

---

[1] *See Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

[2] Some of the documents in this case refer to November 6, rather than November 7, as the date the direct appeal was denied, but November 7 is the actual date, based on the superior court's docket for the direct appeal, referred to below.

On October 19, 2004, the superior court reversed and remanded the matter for further proceedings, reasoning that because Champney's first PCRA petition merely restored his direct-appeal rights, his second PCRA petition should be considered his first, thereby requiring appointment of counsel under Pa. R. Crim. P. 904 to assist him in determining if he could satisfy any of the grounds for filing an untimely petition under 42 Pa. C.S. § 9545(b)(1). (Id.).

On February 28, 2005, counsel filed an amended PCRA petition. On September 30, 2005, the trial court dismissed the petition as time-barred but also discussed Petitioner's claims and found them without merit. (Doc. 47, trial court opinion). On August 15, 2006, the superior court affirmed, agreeing that the petition was time-barred. (Doc. 64, CM/ECF pp. 9-13, *Commonwealth v. Champney*, No. 1783 MDA 2005 (Pa. Super. Aug. 15, 2006). On September 28, 2007, the Pennsylvania Supreme Court denied allowance of appeal (doc. 64, CM/ECF p. 14), and on May 27, 2008, the United States Supreme Court denied certiorari. 128 S.Ct. 2503, 171 L.Ed.2d 791.[3]

B.    *The Hearing on Petitioner's Mental Competence
to File a Timely 2254 Petition*

Two expert witnesses testified for Petitioner at his mental-competency hearing, Dr. J. Daniel Ragland, a neuropsychologist, and Dr. Julie Kessel, a board-

---

[3]  On August 4, 2008, Petitioner filed another PCRA petition in the trial court, which that court dismissed on November 5, 2008. Petitioner has appealed that decision to the superior court. (Common-pleas docket for *Commonwealth v. Champney*, No. CP-54-CR-1206-1997, available on http://ujsportal.pacourts.us).

certified psychiatrist. Dr. John E. Gordon, a neuropsychologist, testified for the Respondents. Pertinent parts of the hearing are as follows.

Dr. Ragland administered a series of tests to Petitioner specifically to determine if he had "any kind of organic brain damage that might have compromised his ability to participate in his own defense." (Doc. 88, hearing transcript, CM/ECF p. 4). The third version of the Wechsler Adult Intelligence Scale, the WAIS III, indicated a full scale IQ of 85, placing Petitioner in the low average range, the sixteenth percentile of the population. (*Id.*, p. 14). Petitioner was also reading at the eighth-grade level. (*Id.*, p. 17).

Dr. Ragland was testing for executive abilities, of which there are different types. As he testified, there is "the ability to plan and problem solve . . . to take feedback, to guide our behavior and change our strategies . . . to inhibit our current responding in order to shift our responding, so our ability to learn that something is not working right and change our approach and try something new." (*Id.*, p. 20).

Some of the subtests on the IQ test measuring different executive abilities were significantly below Champney's full-scale IQ range. (*Id.*, p. 15). Champney had difficulty with the subtests for working memory, (*id.*, p. 15), what the doctor defined as the ability to hold information in mind while looking down the page for consistent information. (*Id.*, p. 19). Petitioner's "working memory index" was "borderline," a score of 75, placing him in the fifth percentile. (*Id.*, pp. 15-16).

The Auditory Consonant Trigrams Test is an attention working-memory task in which the person is given three numbers to remember, asked to count backward for a period of time and then asked to recite the numbers. On this test, Petitioner had moderate impairment on a short delay but was less impaired on the longer delays. (*Id.*, p. 21). On the Trail Making A and B Tests he was in the average range. On these tests, the information is on a page in front of the person being tested. In one version, the page has letters that have to be connected sequentially and in the other, the page has letters and numbers and he must alternate between the letters and numbers. Petitioner did better on these tests than on the Auditory Consonant Trigrams Test because he did not have to hold the information in mind. (*Id.*, pp. 21-22). As Dr. Ragland testified, the Trail Making Tests provided more "structure," meaning the information was on the page in front of him. (*Id.*).

The Continuous Performance Test measures the ability to sustain attention, originally designed to select radar operators who had to look at radar screens for long periods. The person looks at a computer screen and has to press a button when the right sequence appears but avoid pressing the button when the wrong sequence appears. Petitioner "was severely impaired in terms of his ability to inhibit incorrect responding," placing him in the first percentile. (*Id.*, p. 22-23).

The Wisconsin Card Sorting Test measures the ability to plan and develop a strategy and to show flexibility in changing the strategy. Champney "was able to form a strategy. [As] [t]he number of cards it took him to form the strategy was increased, [ ] he was impaired in the amount of time it took him to form the strategy, but he was able to

-7-

form the strategy and get the correct number of categories on the test." (*Id.*, pp. 24). During the test, he did show a "greater difficulty" in "perseverative responses," doing the wrong thing over and over again, and was in the borderline range. This difficulty relates to the ability to come up with a new strategy when the previous approach does not work. (*Id.*, p. 24).

The Booklet Category Test uses abstract designs and is similar to the Wisconsin Card Sorting Test but is more difficult as it provides less structure for determining the pattern in the designs. (*Id.*, pp. 24-25). Petitioner showed "moderate impairment" on this test (*Id.*, p. 26).

For memory function, Dr. Ragland administered the California Verbal Learning Test, which measures learning ability and involves two lists of words. Champney had "severe impairments" in initial recall of words but once he finally learned the words he remembered them over time. (*Id.*, p. 30).

The Brief Visuospatial Memory Test measures the ability to recall visual designs. The person is shown a page that has line drawings on it of geometric shapes and they have to draw the same designs from memory. Petitioner was "moderately to severely impaired" on this test. (*Id.*, p. 31). Another part of the test measured whether he could recognize a new item as opposed to an old one from being shown new and old items together. On this, he did "average," which means that he benefits from "structure," (*id.*, p. 31), having the information in front of him.

Based on the testing, Dr. Ragland opined that Petitioner has "a memory problem that's due to problems in learning and problems in retrieval, not a problem in storage or in rapid forgetting. . . He's remembering what he learns, but he's having trouble learning it, having trouble retrieving it, which is more consistent with kind of frontal and striatal type memory problems." (*Id.*, p. 32). Dr. Ragland also said: "We've got this theme going where he's not -- he's doing okay if things are well structured, if the information is there in front of him. But he really has difficulty when there's not that structure there and when things are more ambiguous." (*Id.*, p. 33).

Dr. Ragland was asked his opinion on whether Petitioner could comprehend postconviction proceedings and navigate through them without the assistance of counsel. He replied:

> I came to the opinion that the problems we've been talking about and his ability to kind of quickly problem solve and adjust his strategies based on things not working and guide his behavior and do these kind of cognitive control abilities, those being impaired would likely interfere with his ability to navigate this kind of complex legal system and plan and organize those abilities.

(*Id.*, p. 52).

Dr. Ragland was then asked if his opinion would change if Petitioner had "full access to a fully-equipped law library with reference books and case books." (*Id.*). The doctor answered:

> A. Well, no. I mean, if we can imagine ourselves walking into the library, we have to think about, where do we go, what do we get off the shelf, when we get it off the shelf, what part of the book do we go to, and when we read something, it

> makes us think of something else, and we have to go find
> another thing in a related part of the book.
>
> Those, I would think, he would have difficulty with. If he
> walks into the law library and somebody brings him the book,
> and brings him the book and sits it down and says, read this
> and make a note, now read this and make a note, he would
> have less difficulty doing that. But that kind of planning that
> all out and guiding all of that is where I think he would have
> trouble.

(*Id.*, pp. 52-53).

And when questioned about Petitioner's ability to learn and retain

information, Dr. Ragland opined:

> A. Again, I think if he has something structured right in front
> of him, if he's given adequate time, he could learn it, and he
> could retain it. I mean, he does have the reading -- he does
> have the learning disability, but actually his reading was just
> low average. So he would be able to do that adequately with
> sufficient time.
>
> Q. But in a library room in terms of being able to find the
> correct information that was relevant to his case, he would
> have difficulty with that?
>
> A. He would have difficulty with that.

(*Id.*, p. 53).

Dr. Ragland used what he called a "standard process approach" to

deciding what combination, or battery, of tests to administer to Petitioner, as opposed to

a "fixed" battery, such as the "Holstein-Reitan" battery. (*Id.*, p. 39). Dr. Gordon,

Respondents' neuropsychologist, criticized this approach, asserting that the Holstein-

Reitan battery should have been used as the tests that make up this battery have been

normed against each other. As a result, each test can be compared to each other to

assess the nature of any brain lesion. (*Id.*, p. 109). He also testified that Champney's performance on some of the tests were average or below average, (*id.*, p. 118), and in his view, "Champney has difficulty in his ability to maintain his attention and concentration particularly when he's overwhelmed and has to process too much information at one time, which is more related to anxiety factors . . . than it is to brain related factors." (*Id.*).

Dr. Kessel, Petitioner's psychiatrist, testified that Petitioner had the following conditions that affected his ability to pursue his legal rights. First, Champney suffers from "cognitive disorder not otherwise specified and learning disability." (Doc. 89, CM/ECF p. 30). The cognitive disorder "impacts his ability to engage in complex planning and time lines." (*Id.*, p. 33). The "disorder is critical to understanding why it would be difficult for him, if not impossible, to develop a time line for himself and engage in the complex series of behaviors, juggle various kinds of information at the same time over time, and change his course of action with feedback, for instance, from the courts." (*Id.*).

Second, Champney has a chronic anxiety disorder characterized by panic attacks, symptoms of posttraumatic stress disorder, and generalized anxiety. (*Id.*, pp. 34-35). The anxiety interferes with his ability to focus. (*Id.*, p. 35). Champney's murder case was a significant cause of anxiety for him. (*Id.*, p. 44). Dr. Kessel was not "able to move through [certain topics] in an organized fashion with Mr. Champney because his mind was very distracted. He jumped around a lot. He took a lot of redirection to bring

back to topic." (*Id.*, pp. 36-37).  Third, Petitioner suffers from major depression, (*id.*, p. 42), and "mixed personality disorder." (*Id.*).

Dr. Kessel testified that Petitioner "was not able to link [the phrase] statute of limitations to the word habeas." (*Id.*, p. 49).  Champney did, however, think that "the statute of limitations had something to do with a time limit for getting charged with things." (*Id.*, p. 48).  Dr. Kessel did not specifically ask him about the statute of limitations as it related to a habeas petition. (*Id.*, p. 57).

Dr. Kessel opined that Petitioner was not competent to file a federal habeas petition in a timely way.  She based her opinion on the following:

> A lot of that is based on the combination of the cognitive disorder not otherwise specified, the anxiety disorder that is chronic and unremitting and severe, and his major depressive disorder . . . . Each of those disorders was in effect during the [interval] of time when he would have had to track and file that petition.
>
> The cognitive disorder is especially relevant because, in order to file such a petition, he would have had to keep very good clear records as to the time line of each of the elements of his appeal petitions.  And he would have had to juggle at the same time his homicide trial, which was a significant cause of anxiety for him as well.  We know that his cognitive impairment becomes aggravated by the experience of anxiety and depression.
>
> We know that he was having aggravated anxiety and depression during the interval of time that he would have had to file those.  Even without anxiety and depression, it would have been an extreme struggle for him to keep track of the time line, to keep track of the addresses, to develop legal arguments that were relevant for the filing of that petition.

(*Id.*, p. 44-45). During their second interview in July 2005, Petitioner told Dr. Kessel that there were so many books in the law library "that he wouldn't have a clue which book to look in or how to figure out what he was supposed to read," and that "it would be a good idea to have all the information he would need in a single book." (*Id.*, pp. 31, 46-47).

As noted in the procedural history of the case, shortly after the verdict against him, Petitioner began filing petitions for relief, on November 20, 1998, January 19, 1999, and February 23, 1999. Jeffrey Miller was an inmate at the Schuylkill County Prison while Petitioner was incarcerated there during his trial. Miller testified that Champney asked him after the verdict to assist him, and Miller prepared the motions mentioned above that were filed on Champney's behalf. (*Id.*, pp. 3, 5, 7).

III.   *Discussion*

      A.   *The Petition Is Time-Barred, Unless Equitably*
          *Tolled Because of Petitioner's Mental Incompetence*

As noted, Respondents have moved to dismiss this petition as time-barred. Putting aside Petitioner's equitable-tolling argument based on mental incompetence (which will be dealt with below), we agree that application of the relevant statutory provisions under the controlling case law establishes Respondents are correct. We reject Petitioner's arguments to the contrary, made in his November 2004 brief in opposition to Respondents' motion to dismiss.

There is a one-year statute of limitations for filing a habeas corpus petition under 28 U.S.C. § 2254. *See* 28 U.S.C. § 2244(d)(1). In pertinent part, the limitations period begins to run from the latest of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," *id.*, § 2244(d)(1)(A), or "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action." *Id.*, § 2244(d)(1)(B).

The limitations period is also subject to tolling, in two different ways. First, section 2244(d) provides for statutory tolling, tolling the limitations period during the time "a properly filed application for State post conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." *Id.*, § 2244(d)(2). Second, the Third Circuit allows equitable tolling, a rule long applicable to other statutes of limitations and, by a natural extension, to section 2254 petitions as well. *See Miller v. New Jersey Dep't of Corr.*, 145 F.3d 616, 617-18 (3d Cir. 1998).

Respondents argue that the 2254 petition is time-barred because the superior court denied Champney's direct appeal on November 7, 2002, which gave him until December 9, 2002, to file a petition for allowance of appeal with the Pennsylvania Supreme Court. *See* Pa. R. App. P. 1113(a).[4] The limitations period began to run on that date (the expiration of the period for seeking direct review), *see Morris v. Horn*, 187 F.3d 333, 337 and n.1 (3d Cir. 1999), and expired on December 9, 2003, one year later.

---

[4] The last day of the thirty-day period fell on a weekend, so the appeal period was extended to Monday, December 9, 2002. *See* 1 Pa. C.S. § 1908.

-14-

Thus, the 2254 petition is untimely since Petitioner did not file it until March 8, 2004, ninety days after the December 9, 2003, deadline. We agree with this analysis.

In opposition, Petitioner makes three arguments that the petition is timely, the first one based on a calculation of the limitations period under section 2244(d)(1)(A), the second on equitable tolling (but not grounds arising from mental incompetence), and the third on a calculation of the limitations period under section § 2244(d)(1)(B).

On his first argument, he contends that the beginning date of the limitations period is ascertained by not only tacking on the thirty-day period for petitioning the Pennsylvania Supreme Court for allowance of appeal but also the ninety-day period for seeking certiorari from the United State Supreme Court. On this approach, the limitations period began to run on March 7, 2003, 120 days after November 7, 2002, so Petitioner had until March 7, 2004, to file his petition. However, since March 7, 2004, was a Sunday, Champney could file his petition the next day, Monday, March 8, 2004, which he did, making his petition timely.[5]

We disagree with this method of calculating the limitations period. It is true that the ninety-day period for seeking certiorari is included when determining when the limitations period begins to run, even if a petitioner did not apply for certiorari, *Kapral v. United States*, 166 F.3d 565, 570-71 (3d Cir. 1999),[6] but the ninety-day period is only

---

[5] See Fed. R. Civ. P. 6(a)(1)(C)(the last day of a period is not counted if it is a Saturday, Sunday or legal holiday), formerly found at Fed. R. Civ. P. 6(a)(3).

[6] *Kapral* dealt with the limitations period for filing a motion under 28 U.S.C. § 2255 to contest a federal conviction, but the Third Circuit applies the same rules in calculating the

(continued...)

-15-

included if a petitioner had first sought review from the "state court of last resort," U.S.

Sup. Ct. R. 13.1, as "the highest court of a state in which a decision could be had," 28

U.S.C. § 1257(a). *Riddle v. Kemna*, 523 F.3d 850, 855 (8th Cir. 2008).[7] This is so

because absent an appeal to the court of last resort, the Supreme Court has no authority

to provide direct review of a state-court decision, *id.*, which in turn means that the ninety-

day period for seeking certiorari is excluded from the calculation of the limitations period

under section 2244(d)(1)(A). *Id.* This conclusion follows from the language of section

2244(d)(1)(A) which starts the period from the expiration of time for seeking direct

review. As the Third Circuit noted in *Kapral*, *supra*, even if a petitioner does not seek

certiorari during the ninety-day period, taking the necessary preliminary step of seeking

review in the court of last resort retains his right to do so, thus rendering a judgment final

for the purpose of section 2244(d)(1)(A) only after that period has expired. 166 F.3d at

571.[8] On the same logic, when a petitioner has not sought review in the state's court of

last resort, and he thus has no right to file a certiorari petition, there is no point in

including the ninety-day period in calculating when the limitations period begins to run.[9]

---

[6] (...continued)
limitations period for a 2254 petition. *See Swartz v. Meyers*, 204 F.3d 417, 421 and n.4 (3d Cir. 2000).

[7] That the review may be discretionary is irrelevant. *Id.* (dealing with discretionary review in the state supreme court).

[8] *Kapral* dealt with a federal defendant, but that distinction is immaterial as he had done the equivalent of seeking review in the state court of last resort by filing a direct appeal in the federal court of appeals.

[9] We note that in all of the cases Petitioner cites to include the ninety-day certiorari-
(continued...)

For Champney, this means that, on a straightforward calculation of the statute of limitations, his 2254 petition is time-barred. Champney did not seek discretionary review in the Pennsylvania Supreme Court, the court of last resort, stopping the appellate process after the superior court denied his direct appeal. Thus, only the thirty-day period for seeking review in the state supreme court is counted, *see Heleva v. Brooks*, 581 F.3d 187, 193 (3d Cir. 2009), and the limitations period began to run, as Respondents assert, on December 9, 2002, Champney's deadline for seeking such review. In turn, the limitations period expired on December 9, 2003, one year later, thus making Champney's 2254 petition filed on March 8, 2004, untimely.[10]

Champney's second argument is that his petition is timely because he is entitled to equitable tolling. *See Schlueter v. Varner*, 384 F.3d 69, 75 (3d Cir. 2004).[11] The Supreme Court has not decided if equitable tolling applies to section 2254's limitations period, *see Lawrence v. Florida*, 549 U.S. 327, 127 S.Ct. 1079, 166 L.Ed.2d

---

[9] (...continued)
application period, the defendants had also either taken direct appeals from their federal convictions, *Kapral, supra*; *United States v. Garcia*, 210 F.3d 1058 (9th Cir. 2000); *United States v. Gamble*, 208 F.3d 536 (5th Cir. 2000), or had sought review in the state court of last resort. *Locke v. Saffle*, 237 F.3d 1269 (10th Cir. 2001); *Williams v. Artuz*, 237 F.3d 147 (2d Cir. 2001); *Bronaugh v. Ohio*, 235 F.3d 280 (6th Cir. 2000).

[10] In this part of his opposition brief, Champney has made a passing reference to his appointed counsel's failure on his restored direct appeal to advise him with regard to filing an appeal with the state supreme court. (Doc. 27, p. 15). We believe counsel's conduct, if relevant, would only come into play in determining whether the limitations period should be equitably tolled. *See, e.g., Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2001).

[11] We note again that we deal here only with Petitioner's arguments for equitable tolling not based on mental incompetence. Equitable tolling based on mental incompetence is dealt with in the next section of this memorandum.

924 (2007), but has stated that if it would apply, the petitioner "must show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 336, 127 S.Ct. at 1085 (quoted case omitted). *Accord Urcinoli v. Cathel*, 546 F.3d 269, 272-73 (3d Cir. 2008)(in part, equitable tolling applies "'if the plaintiff has in some extraordinary way been prevented from asserting his rights'" and he has acted diligently to pursue his rights)(quoted case omitted). Petitioner has the burden of showing that he was prevented in some extraordinary way from asserting his rights and that he acted diligently. *Id.* at 273. A failure to exercise reasonable diligence after the extraordinary circumstance began breaks the causal relationship between the circumstance and the untimely filing. *Brown v. Shannon*, 322 F.3d 768, 773 (3d Cir. 2003)(quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)).

Before addressing Petitioner's arguments for equitable tolling, we will dispose of his contention, based on *Fahy v. Horn*, 240 F.3d 239 (3d Cir. 2001), that we should relax the standard for applying equitable tolling because the convictions challenged here were used as an aggravating circumstance in the penalty phase of a murder case against him, where Champney was given the death sentence.[12]

We reject this contention. *Fahy* is distinguishable. It is true that in that case the Third Circuit did not strictly apply equitable tolling because that was a death

---

[12] That case was also tried in Schuylkill County. *Commonwealth v. Champney*, No. CR-1243-1998. On June 3, 2008, the trial court granted a PCRA petition in that case, and vacated the conviction and sentence. That decision is now on appeal in the Pennsylvania Supreme Court at docket numbers 574 CAP and 575 CAP.

case. But it also relaxed its equitable tolling standard because of the uncertain state of Pennsylvania law at the time Fahy decided to return to state court to adjudicate a fourth PCRA petition rather than file a federal habeas petition. Fahy's choice rendered his federal petition untimely after the Pennsylvania Supreme Court ruled that the state postconviction petition was not properly filed. In deciding to toll the limitations period, the Third Circuit explained, in part:

> The law at the time of Fahy's petition was inhibitively opaque. Fahy filed his fourth PCRA petition in November, 1997, months before the Pennsylvania Supreme Court announced that it would no longer observe the relaxed waiver rule in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998). Further, the Pennsylvania Supreme Court did not clarify that the state PCRA statute was jurisdictional and not waivable until 1999 in *Commonwealth v. Banks*, 556 Pa. 1, 726 A.2d 374 (1999). In *Banks*, 126 F.3d at 214, we rejected the Commonwealth's claim that a PCRA petition would be time-barred and required Banks to return to state court because we could not confidently determine that the state court would not apply the relaxed waiver rule it had applied in previous capital cases. If we could not predict how the Pennsylvania court would rule on this matter, then surely we should not demand such foresight from the petitioner. Fahy's misjudgment, therefore, was reasonable.

*Id.* at 245. Conversely, in the instant case, Petitioner faced no such procedural uncertainty. Champney attempts to bring his case in line with *Fahy* by pointing to the "numerous constitutional" claims in his petition and the alleged "denial of his trial transcripts, the confiscation of his legal papers and the absence of counsel on direct appeal." (Doc. 27, p. 19). However, none of these is a reason to relax under *Fahy* the normal standard for evaluating Petitioner's claim of equitable tolling, for that case dealt

instead with an uncertain procedural route through the state courts. It was also a death case and this one is not. We will therefore apply the usual standard.

Champney relies on the following to toll the statute. First, he makes two claims of the deprivation of legal materials that should, in his view, toll the statute. He asserts that in April 2003 his legal materials, including those for this case, were improperly confiscated from him at the Schuylkill County Prison while he was attending a postconviction hearing on April 8 in his murder case, and the materials were never returned to him when he went back to state prison at SCI-Greene.

We reject this claim because Champney has failed to allege that he acted with reasonable diligence to attempt to file a timely petition after the supposed confiscation. Champney had about eight months remaining in the limitations period when his materials were allegedly confiscated, yet does not aver that he made any attempt to regain their possession. *See Robinson v. Johnson*, 313 F.3d 128, 142 (3d Cir. 2002)(reasonable diligence not shown when petitioner filed a prison grievance for return of his legal papers two months after the expiration of the limitations period); *Cooper v. Price,* 82 Fed. Appx. 258, 261 (3d Cir. 2003) (nonprecedential)(petitioner not entitled to equitable tolling when he "fail[ed] to adequately explain why he could not have reproduced or regained the allegedly confiscated materials in the six months between the confiscation . . . and the filing deadline"). Nor did he at least attempt to file a timely petition and seek to clarify it after he gained access to his papers. *Robinson*, 313 F.3d at 143. *See also Brown, supra,* 322 F.3d at 773 (equitable tolling does not apply if the

petitioner, with reasonable diligence, could have filed on time a simple petition notwithstanding the extraordinary circumstance).

Petitioner next asserts he is entitled to equitable tolling because he never received copies of his trial transcripts, despite repeated attempts to obtain them. He alleges he made the following unsuccessful attempts: (1) on March 1, 1999, he filed a pro se "Order for Transcript" with the trial court, requesting all of the transcripts from his trial and sentencing; (2) on May 6, 1999, he wrote to the Clerk of Courts, requesting all of his transcripts; (3) on May 14, 1999, he again wrote to the Clerk of Courts for all his transcripts; and (4) in a letter dated September 19, 2001, to the attorney who represented him on his appeal to the superior court on his first PCRA petition, he requested a copy of "Mr. Long's" sentencing transcripts.[13]

We are not persuaded for two reasons. First, all of the attempts to obtain the transcripts occurred before December 9, 2002, the date the limitations period began to run. Petitioner's failure to try to obtain the transcripts during the one-year period Congress gave him to prepare a 2254 petition shows a lack of reasonable diligence. Indeed, he failed to do anything in the approximate eleven-month period between his last attempt on September 19, 2001, to obtain Long's sentencing transcript and December 9, 2002. The remainder of his attempts occurred between March and May of 1999, but Champney did manage to file his first PCRA on February 4, 2000, raising "various issues including trial counsel's failure to pursue a direct appeal." *Champney, supra*, 783 A.2d at

---

[13] Long was Petitioner's codefendant.

-21-

839. In circumstances like these, courts have rejected Petitioner's categorical approach that a lack of access to all his transcripts should toll the statute. *See Lloyd v. VanNatta*, 296 F.3d 630, 633-34 (7th Cir. 2002) (state's alleged refusal to provide a complete trial transcript did not justify equitable tolling when the petitioner "was present at his trial and knew the basis upon which he could have asserted prosecutorial misconduct" in closing argument); *Donovan v. Maine*, 276 F.3d 87, 93 (1st Cir. 2002)(delay in obtaining state postconviction hearing transcript did not justify equitable tolling since habeas petition reiterated grounds already set forth in state postconviction proceedings and the petitioner had attended the postconviction hearing); *Gassler v. Bruton*, 255 F.3d 492, 495 (8th Cir. 2001)(recognizing a petitioner's desire to have a complete transcript before seeking postconviction relief but refusing to toll the statute when, in part, the petitioner did not specify which claims could not be asserted for lack of a complete transcript); *White v. Shannon*, 2003 WL 21771723 at *5 (E.D. Pa.)(rejecting claim that failure to provide transcript of the last day of trial supposedly containing prosecutor's improper closing argument, noting that "[i]t is not required that a petitioner have a complete trial record when filing a state PCRA or a federal *habeas* claim" when the majority of the claims did not depend on the missing transcript and could have been resolved long ago).

Petitioner next argues that he is entitled to equitable tolling because his counsel on his restored direct appeal did not advise him about an appeal to the Pennsylvania Supreme Court, or actually file such an appeal, after the superior court denied the direct appeal on November 7, 2002.  He also contends that the superior court

should have advised him to take an appeal when he was effectively without counsel since his counsel had filed an *Anders* brief. Finally, he complains that the superior court left him without counsel on direct appeal when it did not require an advocate's brief, rather than an *Anders* brief, after it decided the appeal was not frivolous.

None of these contentions are sufficient to toll the statute. As noted, Petitioner must show a causal connection between the extraordinary circumstances and his untimely filing, and he has not explained how the purported failures on the part of direct-appeal counsel or the superior court caused him to file his 2254 petition late. We also note that counsel's omissions usually require some form of affirmative conduct that misleads the petitioner, *see Brown, supra*, 322 F.3d at 773; *Cristin v. Wolfe*, 168 Fed. Appx. 508, 511-12 (3d Cir. 2006)(nonprecedential), and here Petitioner does not allege that he was somehow misled into believing a discretionary appeal had been filed.

Petitioner contends that two conflicts of interest justify equitable tolling. First, his trial counsel later became the District Attorney of Schuykill County but his office continued to represent the Commonwealth in this case on appeal. Second, the Schuylkill County Public Defender's Office has now been twice appointed to represent Champney, even though the office represented his co-defendant in the same case. According to Petitioner, "[t]hese ongoing conflicts graphically illustrate the contempt or indifference shown in the state court system to [his] constitutional rights." (Doc. 27 at p. 26).

We reject this argument for the same reason given above; Petitioner has not explained why these alleged conflicts caused him to file an untimely petition.

Petitioner next argues equitable tolling is justified by the supposedly confusing procedural history of this case in the state courts. In part, he points to the following: (1) four appeals to the superior court in attempts to correct the appellate process; and (2) the PCRA court has twice appointed the Schuylkill County Public Defender's Office to represent him even though it represented his co-defendant in the same case. (Doc. 27, pp. 27-28).

We reject this argument. Of course, a convicted defendant should be able to move in a straight procedural line, if necessary, from trial, to direct appeal, to discretionary appeal, and then to state postconviction proceedings. However, it is not unusual for the direct appeal not to be pursued, and as happened in this case, corrected later by restoration of direct-appeal rights. There is no confusing procedural history here that would justify equitable tolling. Further, Petitioner offers no explanation why the alleged conflicts prevented him from filing a timely petition.

Finally, Petitioner argues that his petition is timely if the limitations period is begun from "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action." 28 U.S.C. § 2244(d)(1)(B). Petitioner argues he was impeded by the same state action he cited in support of his claim for equitable tolling: failure to provide transcripts, confiscation of legal papers, refusal to require an advocate's brief, and abandonment by his counsel on his direct appeal.

Just as in equitable tolling, section 2244(d)(1)(B) requires Petitioner to show that he was prevented from filing a timely petition by the alleged state action. We therefore reject this argument because we have already concluded that none of the cited factors prevented Petitioner from filing a timely petition.

### B. *Petitioner Has Not Established Equitable Tolling by Way of Mental Incompetence*

The Third Circuit has said that mental incompetence is not a per se reason to toll the statute of limitations, but when a person's mental deficiency actually affects his ability to file a timely habeas petition, it may constitute extraordinary circumstances justifying equitable tolling. *Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001), *overruled in part on other grounds by Carey v. Saffold*, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002). The Court of Appeals has not yet had occasion to elaborate on this rule, but district courts in the circuit have. To determine if a person's mental-health or cognitive difficulties prevented him from filing a timely 2254 petition, the courts have looked at, among other factors, whether "'the petitioner handled or assisted in other legal matters which required action during the federal limitations period,'" and whether "'the petitioner supported his allegations of impairment with extrinsic evidence such as evaluations and/or medications.'" *Passmore v. Pennsylvania*, No. 08-705, 2008 WL 2518108, at *3 (M.D. Pa. June 19, 2008)(quoting *McCray v. Oxley*, 553 F. Supp. 2d 368, 372 (D. Del.

2008)).[14] The focus is on "an irremediable inability to access information and make use of it." *Stephens v. Wynder*, No. 07-412, 2008 WL 906524, at *4 (M.D. Pa. Mar. 31, 2008)(quoting *Graham v. Kyler*, No. 01-1997, 2002 WL 32149019, at *3 (E.D. Pa. Oct. 31, 2002)). "'A mental condition that burdens but does not prevent a prisoner from filing a timely petition does not constitute 'extraordinary circumstances' justifying equitable tolling.'" *Id.* at *4 (quoting *United States v. Harris*, 268 F. Supp. 2d 500, 506 (E.D. Pa. 2003)); *Scott v. Ricci*, No. 07-2189, 2008 WL 2684376, at *7 (D.N.J. June 30, 2008). The determination is made on the totality of the circumstances. *Passmore, supra*, 2008 WL 2518108, at *3.

Applying the foregoing principles, we conclude that Petitioner has not met his burden of establishing that he has a mental incompetence that tolls the statute of limitations. At most, his conditions burdened, but did not prevent, the timely filing of a petition. To begin with, we find it significant that in the tests that provided structure, meaning the information was on a paper in front of him, Petitioner was average in abilities (the Trail Marking A and B tests, the Brief Visuospatial Memory test on comparison of new and old items). Second, Petitioner was able to learn. He was not learning at the outset of a test, but over a longer period, was learning (the Auditory Consonant Trigrams test, the California Verbal Learning test). Third, Petitioner was able to form a strategy, although he was in the borderline range in persisting in strategies that

---

[14] Other factors are whether the petitioner was ever "'adjudicated incompetent and, if so, when did the adjudication occur in relation to the habeas statutory period,'" and whether he "'was institutionalized for his mental impairment.'" *Id.* at *3 (quoting *McCray*, 553 F. Supp. 2d at 372).

were not successful (the Wisconsin Card Sorting test). Fourth, Petitioner's full-scale IQ was 85, which placed him only in the low average range of IQs.

Our conclusion that Petitioner was sufficiently functional to have filed a timely 2254 petition is consonant with Dr. Ragland's opinion that if Petitioner "has something structured right in front of him, if he's given adequate time, he could learn it, and he could retain it," noting that while Petitioner has "the learning disability," "his reading was just low average, [s]o he would be able to do that adequately with sufficient time."

Champney had one year to file his 2254 petition after his conviction became final. He made no issue of the adequacy of the prison law library, accepting that it was "a fully-equipped law library with reference books and case books." Given his adequate level of competence, this was enough time for him to have prepared and filed the petition. We note that Dr. Ragland believed that Champney would have "difficulty with" selecting the right book, but Champney did solicit legal help from another inmate immediately after the verdict, so he could have done the same in starting his legal research, which could have begun with a reference book for filing a federal habeas petition.

Dr. Ragland also opined that Petitioner's ability to adjust his strategies was impaired. However, Petitioner would not need the skill of adjusting strategies to file a habeas petition; he would only need to list all his claims with the supporting facts. *See* Rule 2(c) of the Rules governing section 2254 cases.

Dr. Kessel's testimony does not satisfy Petitioner's burden either. She testified that his cognitive disorder, chronic anxiety disorder, major depression and mixed personality disorder prevented him from a timely filing. However, anxiety and depression would not have been disabling, given the one-year period Petitioner had to file. *See also Stephens, supra,* 2008 WL 906524, at *4 (M.D. Pa.)("depression is a normal part of prison life")(collecting cases). The cognitive disorder affected Petitioner's ability to develop a time line, engage in a complex series of behaviors, juggle various kinds of information at the same time over time, and change his course of action with feedback from the courts. However, Petitioner dose not need the latter skill to file a timely petition, and all Petitioner needs to do to keep track of his habeas deadline and issues he would present is to write it all down.[15]

C.    *Petitioner's Amendment to the Petition and Motion to File a Supplemental and Amended Petition*

Petitioner's original petition set forth twenty claims. On April 5, 2008, Petitioner filed an amendment to his petition adding Claim 21, which is based on a conflict of interest that his trial counsel had because counsel was the long-time attorney for a witness against Petitioner in his murder trial. On August 11, 2008, Petitioner filed a motion for leave to file a supplemental and amended petition. The supplemental and

---

[15] Dr. Kessel also testified that Petitioner "was not able to link [the phrase] statute of limitations to the word habeas." Champney did, however, think, correctly, that "the statute of limitations had something to do with a time limit for getting charged with things." And Dr. Kessel did not pursue the issue by specifically asking him about the statute of limitations as it related to a habeas petition.

amended petition, attached as an exhibit to the motion, includes the twenty claims in the original petition and adds Claim 21 from the April 2008 amendment along with six more claims (Claims 22 through 27).

Petitioner justifies the timeliness of the additional seven claims as follows. First, Claims 23 through 26 relate back to the claims in the original petition. *See Mayle v. Felix*, 545 U.S. 644, 650, 125 S.Ct. 2562, 2566, 162 L.Ed.2d 582 (2005). Second, Claim 21, based on his trial attorney's conflict of interest, is timely because it is based on an FBI witness statement only discovered on April 6, 2007, when it was produced to Petitioner in response to a subpoena in the postconviction proceedings in his murder trial. Under 28 U.S.C. § 2244(d)(1)(D), a habeas petition may be filed within a year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Hence, Petitioner argues the claim is timely since it was filed on April 4, 2008, less than a year later. He also cites *Slutzker v. Johnson*, 393 F.3d 373, 382 (3d Cir. 2004). Third, Claim 22 is timely because it relates back to Claim 21 and because it was raised within a year of a state-court finding in postconviction proceedings in the murder case, made on June 3, 2008, that his attorney had a conflict of interest. In support, Petitioner cites *Johnson v. United States*, 544 U.S. 295, 125 S.Ct. 1571, 161 L.Ed.2d 542 (2005). Fourth, Claim 27 is timely because it is based on the state court's actions in his PCRA proceedings which terminated on September 28, 2007.

In opposition, Respondents argue that the original petition was untimely and no claims can be added to an untimely petition. Second, we should not entertain

new claims based on the trial court's PCRA findings as the Commonwealth has appealed the trial court's decision vacating the murder conviction and accepting those findings would enable Petitioner to sidestep the exhaustion requirement, *see* 28 U.S.C. § 2254(b)(1)(A), as they have not been subjected to a complete round of state appellate review.

We conclude as follows. Claims 23 through 26 are untimely as they are based on the timeliness of the original petition and we have decided the original petition was untimely; the timeliness of any new claims cannot be based on relation back to an untimely petition. Claim 21 is untimely because, as Petitioner himself acknowledges, under section 2244(d)(1)(D) he must also show due diligence. While he may have discovered the information in the FBI witness statement only on April 6, 2007, he does not also attempt to show that this information could not have been discovered earlier through the exercise of due diligence. He has the burden of showing due diligence under section 2244(d)(1)(D). *See DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2008); *Duran v. Hernandez*, 275 Fed. Appx. 738, 739 (9th Cir. 2008)(nonprecedential); *Young v. Clearfield County Commonwealth of Pleas*, No. 08-05, 2008 WL 1711098, at *1 (W.D. Pa. April 11, 2008). His reliance on *Slutzker, supra,* is misplaced because there, unlike here, the Commonwealth did not dispute that the claim was timely. 393 F.3d at 382 n.9.

Claim 22 is untimely because Petitioner relies on a relation back to Claim 21, and we have decided that Claim 21 is untimely. Petitioner also relies on *Johnson, supra,* for the timeliness of this claim, but that case is distinguishable. In *Johnson*, the

Supreme Court ruled that the statute of limitations could start running from the date a state court vacated a conviction under section 2244(d)(1)(D), but the Court also required that the petitioner show due diligence.  544 U.S. at 302, 125 S.Ct. at 1577.

As for Claim 27, it may be timely, but it fails to state a claim as it is a challenge to the state courts' rulings in postconviction proceedings, and federal habeas corpus review does not extend to state postconviction proceedings.  *Abu-Jamal v. Horn*, 520 F.3d 272, 297 (3d Cir. 2008), *cert. denied*, 129 S.Ct. 1910, 173 L.Ed.2d 1062 (2009).

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: January 5, 2010

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD GRANT CHAMPNEY,          :
                                :
          Petitioner            :
                                :
vs.                             :   CIVIL NO. 1:CV-04-0502
                                :
JEFFREY BEARD, et al.,          :   (Judge Caldwell)
                                :
          Respondents.          :
                                :

**FILED**
ᴴARRISBURG, PA

JAN ' ᵔ 2009

ᴬNDREA, CLERK
Deputy Clerk

*O R D E R*

AND NOW, this 5ᵗʰ day of January, 2010, for the reasons set forth in the

accompanying memorandum, it is ordered that:

> 1. Respondents' motion to dismiss the petition (doc. 18) is
> granted, and the original petition (doc. 1) is dismissed as
> time-barred.

> 2. Petitioner's motion for leave to file a supplemental and
> amended petition (doc. 61) is denied because new claims set
> forth in the proposed supplemental and amended petition,
> Claims 21 through 26, are time-barred, and Claim 27 is not
> cognizable in federal habeas.

> 3. The amendment (doc. 56) to the petition for a writ of
> habeas corpus is dismissed as time-barred.

> 4. A certificate of appealability is denied.

> 5. The Clerk of Court shall close this file.

/s/William W. Caldwell
William W. Caldwell
United States District Judge